IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
JANUARY 17, 2007 Session

# WATCO, a joint venture comprised of Wayne Todd and Wilson Holdings, LP v. PICKERING ENVIRONMENTAL CONSULTANTS, INC., a Tennessee Corporation

### Direct Appeal from the Circuit Court for Shelby County
### No. CT-003944-04   John R. McCarroll, Judge

_____

### No. W2006-00978-COA-R3-CV - Filed June 5, 2007

_____

The plaintiff, a real estate development company, conditionally agreed to purchase real property from a trustee bank if the bank first obtained a satisfactory "Phase I" environmental site assessment of the property. The trustee bank hired the defendant environmental consulting company to perform a Phase I environmental site assessment. After performing an assessment, the defendant prepared a report in which it represented that it had conformed with the applicable professional standard in its assessment, that it had not detected any hazardous materials or environmental concerns at the subject property due to current or past uses of the property, that it had not identified any significant environmental concerns in the surrounding area of the subject property, and that it did not recommend further environmental review of the subject property. The plaintiff purchased the subject property in 1995. During residential development of the subject property in 2004, the plaintiff discovered the remains of a municipal garbage dump which had previously existed adjacent to the subject property, and which extended under a portion of the subject property. The plaintiff had the garbage removed and the land filled, and development was delayed as a result. The plaintiff development company sued the defendant environmental consulting company, alleging professional negligence and negligent misrepresentation. A bench trial was held, and the trial court entered judgment in favor of the defendant. For the following reasons, we affirm.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed

ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Allen T. Malone, R. Porter Feild, Memphis, TN, for Appellant

J. Kevin Walsh, James R. Newsom, III, Memphis, TN, for Appellee

# OPINION

## I. FACTS AND PROCEDURAL HISTORY

This case involves an environmental site assessment of real property. The plaintiff WATCO, a joint venture comprised of Wayne Todd and Wilson Holding Company, ("WATCO" or "Appellant") is a real estate development company. The defendant, Pickering Environmental Consultants, Inc. ("Pickering" or "Appellee"), is a company that provides environmental site assessments for clients involved in commercial transactions. In 1994, the American Society for Testing and Materials ("ASTM") developed and published an industry standard to guide environmental professionals in their performance of "Phase I" environmental site assessments. This standard was known as ASTM Practice Standard E1527-94 ("the ASTM Standard" or "the Standard"), and it was effective in 1995.

The real property at the center of this dispute is a 169 acre tract ("the subject property") on Highway 70/Summer Avenue near Brunswick Road in Shelby County, Tennessee. In December of 1994, Peter Norfleet signed a quitclaim deed conveying title of the subject property to the Norfleet Charitable Remainder Uni-Trust. National Bank of Commerce ("NBC") served as trustee of the Norfleet Charitable Remainder Uni-Trust. Fletcher Haaga was the trust officer for NBC assigned to administer the assets of the trust. According to Mr. Haaga, the purpose of this trust was to generate cash flow for Mr. Norfleet and his wife through the sale of the subject property. Joel Smith of VCM, Inc., a real estate company, was selected to be the real estate agent responsible for listing the subject property.

In May of 1995, Kemmons Wilson and Wayne Todd, acting on behalf of the joint venture WATCO, contracted with NBC to purchase the subject property for $880,588.00. WATCO intended to develop a residential subdivision on the subject property, which was undeveloped at the time. The purchase contract provided that the sale was conditional upon a "Phase I Environmental Survey satisfactory to Buyer (at Seller's expense)," and Pickering was selected by NBC as the company that would provide this service. On May 31, 1995, Timothy McCaffery, a Pickering geologist, submitted a letter agreement to Mr. Haaga which stated the purpose of the Phase I environmental site assessment, the scope of the work to be performed, compensation of $1,800 to be paid for performance of the environmental site assessment, the performance schedule, and the client's responsibilities concerning the work to be performed. The letter agreement recited, "The Engineer understands the Project to be an undeveloped, wooded 169 acre tract of land." The letter agreement provided in part:

> The Engineer's services listed in this Scope of Work are in conformance with the scope of ASTM Practice E 1527 and exceed the Practice in Items 2 and 7 of this Scope of Work. No other testing for specific solids, liquids or gases, such as tank testing, soil boring and testing, air monitoring, asbestos testing, radon testing or magnetic survey is included in this Phase I Environmental Site Assessment.

-2-

Additional testing can be provided in a future Phase II study, if required, and authorized in writing by the Client. The Scope of Work does not include any wetland investigation.

Items 2 and 7 of the letter agreement stated:

2. Provide a USGS 7.5 min. Topographic Map, vicinity map (street map with subject property accurately located) and a site plan showing subject property and detailing the locations of any concerns.

. . .

7. Provide a report of the findings of the Phase I Environmental Site Assessment. A separate letter containing the Engineer's recommendations regarding the subject property will be attached to the report.

Mr. Haaga sent a letter in return on June 1, in which he indicated NBC's agreement to the terms and asked that Joel Smith, the real estate agent, be utilized as the site contact "to obtain many of the items requested."

Three employees of Pickering conducted a Phase I environmental site assessment of the subject property in the summer of 1995: Mr. McCaffrey, who served as project manager, was the primary author of the Phase I report, and was further responsible for records review and interviews regarding the subject property; Jason Balogh, a summer intern who conducted site reconnaissance and inspection of the subject property and acted under the supervision of Mr. McCaffrey; and Edward Powell, an engineer who provided senior review of the Phase I report.

Pickering provided NBC the completed Phase I report in July of 1995. Pickering also provided WATCO a revised copy of the report in August of 1995, which was essentially identical to the one provided to NBC. The cover letter attached to this report provided as follows:

Dear Mr. Wilson and Mr. Haaga:

You have requested our opinion with respect to the existence of hazardous materials or environmental concerns at the above referenced Property (the "Property"). The attached opinion is being made to you in connection with the sale of the Property. We understand that you will rely on this opinion for such purposes.

After a review of the Property and available record documents regarding same, we have not detected any hazardous materials or environmental concerns at the Property due to current or past uses of the property itself. No significant environmental concerns were

-3-

identified in the surrounding area which would represent a significant environmental concern to the Property.

Further environmental review of the subject Property is therefore not recommended at this time. The report and this letter has [sic] been revised to add the names of other entitles [sic] who may rely on this opinion.

The accompanying report detailed the efforts of Pickering in performing the Phase I environmental site assessment. Relying on the report, WATCO closed its purchase of the subject property on August 15, 1995.

Located adjacent to the subject property to the west is Freeman Smith Park, which is presently the site of a baseball park, as was the case at the time of the Phase I assessment in 1995. This property was, at one time, also owned by Mr. Norfleet and his family's trust. Although it was unknown by either WATCO or Pickering at the time of the Phase I assessment in 1995, this property had been the site of a residential garbage dump known as "Craven Road landfill." The dump was not an approved site by the Shelby County government, but served the communities of Brunswick, Bolton, and Barrettsville from approximately 1955 until it was closed in the late 1970's. Under two separate deeds in 1980 and 1986, Mr. Norfleet and NBC transferred this property to Shelby County for the use and benefit of the Shelby County Conservation Board, which later developed Freeman Smith Park.

In March of 2004, while grading a portion of the subject property for the purposes of developing a residential subdivision, contractors for WATCO discovered garbage buried 3 to 5 feet beneath approximately 25 to 30 acres of the western portion of the subject property. It was subsequently discovered that this garbage had spilled onto the subject property from the formerly existing Craven Road landfill, now Freeman Smith Park. WATCO incurred significant costs in removing the garbage and filling the land, and it suffered delays in completion of the residential subdivision. It is stipulated that the residential garbage was not tested for the presence of hazardous waste.

On July 8, 2004, WATCO filed a complaint in the Shelby County Circuit Court, alleging that Pickering breached the professional standard of care by which it was bound in performing the 1995 Phase I environmental site assessment and that it misrepresented certain facts in a business transaction relating to the subject property.[1] The gravamen of the complaint was that Pickering had "failed to determine and advise WATCO of the existence of the disposed solid waste" on the subject

---

[1] Pickering filed a third party complaint against NBC, seeking indemnity under the terms of its contract for the Phase I assessment. NBC filed a motion to dismiss the third party complaint based upon an arbitration provision in the contract, which the trial court granted. Pickering then amended its answer to name NBC as a comparative tortfeasor. WATCO amended its complaint to name Diversified Investment Co., Inc., which then held the Norfleet trust, as a defendant. The trial court ultimately dismissed Diversified Investment Co., Inc. from the proceedings and struck Pickering's defense of comparative fault by NBC, leaving WATCO and Pickering as the sole parties in this litigation.

property and "failed to determine and advise WATCO of the former use of the adjoining property as a long-time garbage dump." WATCO sought damages of not less than one million dollars, representing costs of removing the garbage, interest charges suffered from the delay in development, and the lost profits from WATCO's alleged loss of use of approximately 5 acres of the subject property for WATCO's intended residential subdivision purposes.

A bench trial was held on February 20-23, 27, 28, and on March 2, 3, and 9, 2006, before the Honorable John R. McCarroll, sitting by interchange.[2] At trial, WATCO and Pickering each called expert witnesses to testify on the subject of Phase I environmental site assessments. Testifying on the behalf of WATCO was Edward Williams. Pickering offered the testimony of William Samford. Both of these individuals possessed significant expertise with the practice of Phase I environmental assessments, as well as with the ASTM Standard. Both experts agreed that the ASTM Standard consisted of four principal components: records review, site reconnaissance, interviews, and preparation of the report itself. Both experts also agreed that Phase I environmental site assessments did not involve any subsurface investigation or soil borings.

The ASTM Standard provided in relevant part:

> 1.1 Purpose – The purpose of this practice, as well as Practice E 1528, it to define good commercial and customary practice in the United States of America for conducting an environmental site assessment[] of a parcel of commercial real estate with respect to the range of contaminants within the scope of Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) and petroleum products. As such, this practice is intended to permit a user to satisfy one of the requirements to qualify for the innocent landowner defense to CERCLA liability; that is, the practices that constitute "all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice" as defined in 42 USC § 9601(35)(B) . . . .
> 1.1.1 Recognized Environmental Conditions – In defining a standard of good commercial and customary practice for conducting an environmental site assessment of a parcel of property, the goal of the processes established by this practice is to identify recognized environmental conditions. The term recognized environmental conditions means the presence or likely presence of any hazardous substances or petroleum products on a property under conditions that indicate an existing release, a past release, or a material threat of a release of any hazardous substances or petroleum products into structures on the property or into the ground, groundwater, or surface water of the property. The term includes hazardous substances or

---

[2] The Honorable D'Army Bailey presided over the proceedings occurring prior to trial.

petroleum products even under conditions in compliance with laws. The term is not intended to include de minimis conditions that generally do not present a material risk of harm to public health or the environment and that generally would not be the subject of an enforcement action if brought to the attention of appropriate governmental agencies.

(footnote omitted). Other notable sections under the ASTM Standard regarding the scope of a Phase I assessment provided in relevant part:

> 4.5.1 Uncertainty not eliminated – No environmental site assessment can wholly eliminate uncertainty regarding the potential for recognized environmental conditions in connection with a property. Performance of this practice or E 1528 is intended to reduce, but not eliminate, uncertainty regarding the potential for recognized environmental conditions in connection with a property, and both practices recognize reasonable limits of time and cost.
>
> 4.5.2 Not Exhaustive – Appropriate inquiry does not mean an exhaustive assessment of a clean property. There is a point at which the cost of information obtained or the time required to gather it outweighs the usefulness of the information and, in fact, may be a material detriment to the orderly completion of transactions. One of the purposes of this practice is to identify a balance between the competing goals of limiting the costs and time demands inherent in performing an environmental site assessment and the reduction of uncertainty about unknown conditions resulting from additional information.
>
> . . .
>
> 4.5.4 Comparison With Subsequent Inquiry – It should not be concluded or assumed that an inquiry was not appropriate inquiry merely because the inquiry did not identify recognized environmental conditions in connection with a property. Environmental site assessments must be evaluated based on the reasonableness of judgments made at the time and under the circumstances in which they were made.

Edward Williams was WATCO's environmental consulting expert. Mr. Williams, a professional engineer, was president of Environmental Testing and Consulting of the Americas, an environmental firm operating in the Memphis area since 1998, and he had formerly been the president of E. F. Williams & Associates, an environmental consulting firm, for 18 years. Mr. Williams also served as chairman for several committees of the Environmental Council of Memphis Area Chamber of Commerce. Mr. Williams testified that he first became involved in the case in March of 2004, after WATCO discovered the buried garbage on its property. He testified that the

debris removed from the property consisted primarily of residential garbage. At the request of WATCO, Mr. Williams investigated possible sources of the garbage, and he first contacted an unidentified employee of the Tennessee Department of Environmental Conservation ("TDEC"), who informed Mr. Williams that although he could locate no record of a garbage dump at that location, that he personally was aware that there had been a landfill in that neighborhood that was known as the Craven Road landfill. Mr. Williams testified that he recognized the name of this landfill from his prior experience as a county commissioner, and that he next contacted the former director of landfills for Shelby County, David Newsom, who verified Mr. Williams's knowledge that Craven Road Landfill had existed at what is presently Freeman Smith Park. Mr. Williams also reviewed topographical maps and aerial photographs of this area and noted its history in the early 1900's as a site for gravel mining operations. After Mr. Williams completed his investigation, WATCO asked him to review the Pickering Phase I report from 1995. Mr. Williams testified that the report did not indicate the prior existence of a landfill at Freeman Smith Park, which is adjacent to the subject property. Mr. Williams was of the opinion that Pickering's failure to identify the existence of the adjacent former landfill or buried garbage on the subject property in its report evinced a lack of conformity with the ASTM Standard, and that Pickering's failure to interview additional persons regarding former uses of the subject property constituted a breach of the professional standard of care.

Pickering's expert, Mr. Samford, was a professional geologist and vice president of geoenvironmental services for Virginia Geotechnical Services, P.C., a company that performed Phase I assessments. Mr. Samford was also a board member, and later, president of the Association of Soil and Foundation Engineers ("ASFE"). Mr. Samford testified that through his involvement with the ASFE, he was appointed to the ASTM committee that developed the ASTM Standard. Prior to trial, Mr. Samford had been asked to review Pickering's 1995 report and express his opinions as to whether the Phase I assessment had been conducted in accordance with the ASTM Standard and the standard of care. In May of 2005, Mr. Samford provided Pickering with his written expert opinion that Pickering's 1995 Phase 1 assessment and report were in conformance with both the ASTM Standard and the professional standard of care. Mr. Samford based his opinion on the ASTM Standard, ASFE studies, the Pickering report, Phase I assessment reports prepared by environmental consulting firms in 1995 in Shelby County, the depositions of Jason Balogh and Joel Smith, and records and maps relied upon by Pickering in its 1995 Phase I environmental site assessment.

In its final judgment entered on April 19, 2006, the trial court included extensive findings of fact and conclusions of law. The proof relied upon by the trial court consisted primarily of the testimony of the two experts, Mr. Williams and Mr. Samford. The court determined both men to be highly qualified, well informed, and credible witnesses on the issue of Phase I environmental site assessments. The court ultimately ruled as follows:

JUDGMENT

The plaintiff, Watco, has the burden of proving that Pickering did not conform with the applicable professional standard of care in

-7-

connection with the Phase 1 Environmental Site Assessment conducted in Shelby County, Tennessee in July of 1995. Based on all of the proof and applicable law, the Court is of the opinion that plaintiff, Watco, did not carry that burden. Pickering complied with the ASTM Standard. The proof was equally balanced as to whether or not Pickering had a duty to conduct further interviews than those called for in the ASTM Standard.

The trial court thereby entered judgment in favor of Pickering. WATCO filed a timely notice of appeal to this Court on May 2, 2006.

## II. STANDARD OF REVIEW

We review findings of fact by the trial court in civil actions *de novo* upon the record of the trial court, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d) (2006). As explained by this Court in **Cumberland Bank v. G & S Implement Co., Inc**, 211 S.W.3d 223, 228 (Tenn. Ct. App. 2006):

> Reviewing findings of fact under Tenn. R.App. P. 13(d) requires an appellate court to weigh the evidence to determine in which party's favor the weight of the aggregated evidence falls. There is a "reasonable probability" that a proposition is true when there is more evidence in its favor than there is against it. Thus, the prevailing party is the one in whose favor the evidentiary scale tips, no matter how slightly.

When our review involves questions of law, no presumption of correctness attaches to the trial court's findings. **Sexton v. Sevier County**, 948 S.W.2d 747, 749 (Tenn. Ct. App. 1997).

## III. ISSUES PRESENTED

On appeal, WATCO presents the following issues for our review:

1. Whether the trial court erred in finding that WATCO did not prove, by a preponderance of the evidence, that Pickering supplied WATCO with negligent misrepresentations in its 1995 Phase I environmental site assessment report, in which Pickering stated that its actions had conformed with the ASTM Standard.

2. Whether the trial court erred in finding that WATCO did not prove, by a preponderance of the evidence, that Pickering breached the applicable standard of care when it conducted a Phase I environmental site assessment of the subject property in 1995 and prepared the corresponding report.

For the following reasons, we affirm the judgment of the trial court.

## IV. Discussion

### *A. Negligent Misrepresentation in a Business Transaction*

The Tennessee Supreme Court has recognized that our state adopted Section 552 of the Restatement (Second) of Torts as the "guiding principle in negligent misrepresentation actions against other professionals and business persons." ***Robinson v. Omer***, 952 S.W.2d 423, 426-428 (Tenn. 1997) (citing ***Bethlehem Steel Corp. v. Ernst & Whinney***, 822 S.W.2d 592, 595 (Tenn. 1991)).  Section 552 provides in relevant part:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

***Robinson***, 952 S.W.2d at 427 (citing Restatement (Second) of Torts, § 552 (1977)).  Contractual privity is not a prerequisite to liability in tort for negligent misrepresentation, as long as (1) the defendant acts in the course of its business, profession, or employment, or in a transaction in which it has a pecuniary interest, (2) the defendant supplies false information meant to guide others in a business transaction, (3) the defendant fails to exercise reasonable care in obtaining or communicating the information, and (4) the plaintiff justifiably relies on the information.  ***See id.*** (citing ***John Martin Co. v. Morse/Diesel, Inc.***, 819 S.W.2d 428, 431 (Tenn. 1991)); *see also* ***McRae v. Hagaman***, No. E2004-00852-COA-R3-CV, 2004 Tenn. App. LEXIS 693, at *13-14 (Tenn. Ct. App. Oct. 25, 2004).

WATCO assigns error to the trial court's judgment in favor of Pickering for the claim of negligent misrepresentation in a business transaction.  WATCO contends that Pickering made a false statement in the 1995 report when it represented that it had complied with the ASTM Standard in performing the Phase I environmental site assessment of the subject property.  WATCO asserts that the evidence presented at trial clearly preponderates against the trial court's finding that Pickering's representation was accurate in this regard.

In its final judgment, after detailing the actions taken by Pickering and weighing the testimony of the experts at trial, the trial court found that the experts agreed that Pickering's actions were in accordance with the ASTM Standard. The trial court's finding with which WATCO expresses the most disagreement is that their expert, Mr. Williams, "testified that Pickering had conformed to the requirements of the ASTM Standard but felt that Pickering should have done more." WATCO argues that this finding was clearly erroneous. WATCO relies upon the testimony of Mr. Williams on direct examination to contradict the trial court's finding. WATCO cites the following exchanges in support of its position:

> Q.    In your opinion, did Pickering Environmental Consultants['s] investigation of the site – its site assessments that it carried out for WATCO comport with the applicable ASTM Standard that you've identified as E1527?
>
> A.    No.
>
> Q.    That would be for the reasons that you have stated in your testimony?
>
> A.    Yes.
>
> . . .
>
> Q.    Okay. Mr. Williams, based on your review of the documents that you have reviewed, you're [sic] sitting here most of this week and last week and listening to the testimony that's come into this case, I'm going to ask you if you have an opinion as to whether Pickering's environmental site assessment of Watco's property comported with the professional standards that are applicable to environmental professionals practicing in Shelby County in this region in the year 1995 when they did the assessment. Yes or no?
>
> A.    In my opinion, no.
>
> Q.    Okay. In your opinion, same question, did the environmental site assessment comport with the ASTM Standard?
>
> A.    No. It lacked information from a person with good knowledge.

Both experts testified that the ASTM Standard for Phase I environmental site assessments consisted of four basic components: records review, site reconnaissance, interviews, and preparation of the report. WATCO has not alleged deficiencies with Pickering's preparation of the report. However, our consideration of this issue requires us to address the remaining three components of the Standard, in light of the arguments presented by the parties.

## 1. Records Review

The Standard provided that the objective of the first step of the Phase I assessment, records review, was "to obtain and review records that will help identify recognized environmental conditions in connection with the property." The Standard also provided:

> 7.1.4 Reasonable Ascertainable/Standard Sources – Availability of record information varies from information source to information source, including government jurisdictions. The user or environmental professional is not obligated to identify, obtain, or review every possible record that might exist with respect to a property. Instead, this practice identifies record information that shall be reviewed from standard sources, and the user or environmental professional is required to review only record information that is reasonably ascertainable from those standard sources. Record information that is reasonably ascertainable means (1) information that is publicly available, (2) information that is obtainable from its source within reasonable time and cost constraints, and (3) information that is practically reviewable.
>
> . . .
>
> 7.1.4.3 Practically Reviewable – Information that is practically reviewable means that the information is provided by the source in a manner and in a form that, upon examination, yields information relevant to the property without the need for extraordinary analysis of irrelevant data. The form of the information shall be such that the user can review the records for a limited geographical area. Records that cannot be feasibly retrieved by reference to the location of the property or a geographic area in which the property is located are not generally practically reviewable.

In its 1995 report, Pickering described the records inquiry it had performed in the Phase I assessment:

> 4.1 Standard Environmental Record Sources, Federal and State
>
> The geographic database search of National and State environmental records review was provided by Vista Environmental Information (enclosed in Appendix 9.3). . . No State listed landfills, incinerators, or transfer stations were listed as located within the designated search radius.
>
> One underground storage tank (UST) facility was identified within the search radius around the subject Property. . . Review of the

database record on this facility showed that this UST facility has reported a release of petroleum products (LUST facility). Due to this facility's distance from the Property and the petroleum plume migration patterns in the local area, this LUST facility does not represent a significant environmental concern to the Property.

The unmappable sites within the Vista report were reviewed and none of the recorded sites were determined to be a significant environmental concern to the Subject Property. The TDEC Division of Superfund in Memphis, TN was contacted regarding any Superfund sites in the area of the Property. Mr. Wm [sic] A. Gebhart wrote in a letter dated [] June 13, 1995, that there are no promulgated state superfund sites at the Property or within a four mile radius of the property. A copy of TDEC's letter has been enclosed as Appendix 9.4.

4.2 Physical Setting Source

No unusual or recognized environmental conditions were apparent on the Topographic Map reviewed for the Subject Property. As noted in the former uses for the Property, the Property had been used for gravel extraction and this activity has produced an uneven topography relief. No recognized environmental conditions were apparent on the Topographic Map for the adjacent properties.

WATCO's expert Mr. Williams testified that, in conducting his own record search in 2004, he obtained the minutes from a Shelby County Conservation Board meeting held in 1978 at which the residential landfill at issue had been discussed. Mr. Williams claimed that Pickering could easily have obtained this record and thereby discovered the prior existence of the Craven Road landfill on the adjacent property at Freeman Smith Park. However, during cross-examination, Mr. Williams admitted that the references to the "Brunswick area" or "Brunswick Site" in these minutes did not sufficiently describe the location of the Craven Road landfill so as to deem the record "practically reviewable" for the purposes of a Phase I assessment of the subject property. Furthermore, the minutes from this meeting clearly indicated that the site was not even a recognized state landfill, as evidenced by the following excerpt:

The landfill site that has been under discussion for quite sometime [sic] was never a contract agreement with R. Vance Norfleet. The site was not a state approved site and the Shelby County Administration decided that this landfill would be closed permanently upon recommendation of Mr. Harbor, Mr. Hays, Mr. David Newsome, landfill director, and Mr. Price. The landfill being put

there would be taken down to Walnut Grove landfill site. The Health
Department stated that one foot of earthen fill would be satisfactory
to cover the site.

Mr. Williams admitted on cross-examination that he could not identify any other public record of
the formerly existing Craven Road landfill.[3] In questioning Mr. Williams, counsel for Pickering had
him identify within the Standard a listing of "Standard Environmental Record Sources" from which
professionals were advised to obtain records when conducting Phase I assessments. Mr. Williams
conceded that these sources were exhausted by Pickering during the assessment and adequately
described within the report. Mr. Williams also agreed that the Vista system utilized by Pickering
and described in the report was an acceptable method of records review under the Standard. Mr.
Samford, Pickering's expert on Phase I assessments, testified that Pickering's efforts satisfied the
records review component of the ASTM Standard.

## 2. Site Reconnaissance

According to the ASTM Standard, the objective of the site reconnaissance component of a
Phase I assessment was "to obtain information indicating the likelihood of identifying recognized
environmental conditions in connection with the property." The Standard provided in part: "8.1
Observation – On a visit to the property (the site visit), the environmental professional shall visually
and physically observe the property and any structure(s) located on the property to the extent not
obstructed by bodies of water, adjacent buildings, or other obstacles."

Mr. Balogh, a Pickering intern who had just received a Bachelor of Science degree in physics
from The University of the South at Sewanee, performed the site reconnaissance of the subject
property on June 28, 1995, after receiving approximately two weeks of training by Mr. McCaffrey
and Mr. Powell. Additionally, the project manager, Mr. McCaffrey later visited surrounding areas
of the subject property to follow up on certain findings reported by Mr. Balogh. In its Phase I
assessment report to WATCO, Pickering described the actions taken in its site reconnaissance and
its corresponding findings:

5.1 Hazardous Substances in Connection with Identified Uses

The site inspection was performed on June 28, 1995 and included a
walk of the subject Property acreage to determine the possible
presence of hazardous materials and environmental concerns.

---

[3] WATCO took the evidentiary deposition of Joe Smith, who it had originally intended to call as a witness at
trial, but who was unavailable because of a medical condition. Joe Smith retired from his position as Director of the
Sanitary Landfill Department of Shelby County in 1976, and he testified regarding his knowledge of the Craven Road
landfill. Under cross examination, he testified that throughout the period of time that he had worked for the county, he
had never seen a map or written record of the Craven Road landfill, nor was he aware of any written documentation
showing the boundaries of the former dump.

No evidence of drum or container storage was apparent. No miscellaneous maintenance substances were observed. The Property facility did not have any signs of contractor use/storage/disposal of hazardous materials.

No environmental permits, TSD facility numbers, EPA generator ID numbers appeared to be necessary for the operations at the subject Property. There was no evidence of process chemicals and storage, battery disposal, or hazardous waste/waste oil disposal.

No individuals were available to interview to help determine any possible source of environmental concern or activity.
. . .
5.5 Indication of Solid Waste Disposal

No evidence of drums, free liquids, odors, or unusual depressions/excavations that would indicate solid waste disposal activity was witnessed. The Property appears to have been formerly used for gravel extraction which produced uneven topograph and depressions in the western 2/3 area of the Property. At the end of Independent Road in the subdivision abutting the Property's southwest corner, a small pile of rubbish, predominantly wood/brush, was observed. No evidence of free liquids or containers with free liquids was found associated with this off-site pile of rubbish. No deleterious materials or stained soils were evident at the Property. An off-site property at the intersection of Brunswick Road and Highway 70 was observed having construction demolition materials filling in a portion of that Property. No drums or liquids or odors[] were found associated with this off-site area of landfilling.

The videotaped deposition of Mr. Balogh was played into the record at trial. Mr. Balogh had begun his employment as a summer intern with Pickering in early June of 1995, and he described his training by Mr. McCaffery and Mr. Powell as follows:

> Q. Well, you say on the job training. Let's be more specific. What kind of on the job training? And let's talk about June. I mean –
> A. Okay.
> Q. – you did the site – you did the inspection that is the subject of this lawsuit two weeks after you went to work for –
> A. That is correct.

-14-

Q. – Pickering? And during that two week period do you recall any specific training that you received to prepare you for that job of doing such an inspection?

A. I visited other sites that Ed [Powell] and Tim [McCaffery] were working on. And they discussed what they were doing at the site. And they basically told me what they would look for when they came to a site and were doing a site assessment. You know, what they were looking for visually and then, you know, as what they would walk around the property and look for.

Q. What do you recall they told you about what they were looking for?

A. Distressed vegetation or obvious signs of dumping. A lot of times above ground dumping or above ground storage tanks. And distressed vegetation would be an important one. And then if there were any water on the property to inspect the water for discoloration that seemed to be out of the ordinary.

Q. During that two weeks prior to June 27 did you go to more than one site along with either Ed Powell or Tim McCaffery?

A. I went to a number of sites. I cannot recall all of them specifically but, yes, we visited a number of sites. Probably one a day or so in those two weeks.

Q. Is this – and during those two weeks either Ed Powell or Tim McCaffery would have been doing an inspection similar to what you did on June 27?

A. Not at all the sites. Some of the sites we were there to do some of the sampling, so I was also trained in some of the sampling during that time. But, yes, we did do – go to other sites that they were working on for site assessments.

Mr. Balogh testified that in performing the site reconnaissance on the subject property on June 28, 1995, he walked the land to look for signs of distressed vegetation or any dumping or any storage tanks that might have been on the site, and he took photographs of the site. Mr. Balogh also stated that during the site visit, he drove the periphery of the site to look at adjacent properties, which included Freeman Smith Park, and took photographs. In the data forms that Mr. Balogh completed during his site visit, he described the topography and elevation of the subject property as follows: "Eastern 1/4 flat from Oliver Creek deposits. Western 3/4 man-made depressions from gravel extraction." Mr. Balogh also reported the presence of healthy vegetation, understory, and deciduous trees on the western portion of the site. On the checklist of "On-Site Characteristics," Mr. Balogh indicated that there was no "evidence of landfill, past or ongoing activity." However, Mr. Balogh did report "landfill/burial activity" as a condition of concern on an adjacent residential property to the southwest of the subject property, where he noted that a "resident own[ed] land on which he . . . allow[ed] building materials to be dumped." Mr. Balogh made handwritten notes on a

-15-

topographic map at the location of Independent Road, describing these building materials as 12 1-gallon paint drums and another much larger drum. Mr. Balogh further described this debris to Mr. McCaffery after his site visit. Mr. McCaffery reviewed Mr. Balogh's findings and photographs, and he testified that he personally visited the adjacent Independent Road dump site to "double-check" Mr. Balogh's findings and found nothing of environmental concern. Mr. McCaffery testified that, during this limited visit, he did not see any evidence of a recognized environmental condition on the subject property or on adjacent properties.

Mr. Williams, WATCO's expert, testified that one site visit would be sufficient to satisfy the site reconnaissance component of the ASTM Standard. Mr. Williams agreed that the Standard provided as follows regarding the identification of solid waste on a site visit:

> 8.4.4.4 Solid Waste – To the extent visually or physically observed or identified from the interviews or records review, areas that are apparently filled or graded by non-natural causes (or filled by fill of unknown origin) suggesting trash or other solid waste disposal, or mounds or depressions suggesting trash or other solid waste disposal, shall be described in the report.

Also during cross-examination, counsel for Pickering quoted Mr. Williams's prior deposition testimony on this issue and questioned the witness regarding its accuracy:

> ["]Question: I'm talking about on the basis of your review of the site reconnaissance that was done in this case. Was there any indication of a recognized environmental condition that you believe should have been reported that wasn't based upon site reconnaissance?
>
> Answer: I don't see anything in this that based on site reconnaissance would have triggered that in and of itself.["]
>
> . . .
>
> "Question: Let's specifically focus on site reconnaissance as contemplated by the standard. That's where I am right now. I'll certainly discuss interviews with you, but let's focus on site reconnaissance. Based upon your review in connection with this case and the formulation of your opinion, is there anything in the site reconnaissance that was done by Pickering that should have noted a recognized environmental condition in the report?
>
> Answer: It doesn't appear so to me.
>
> Question: So if I had walked the site or if you had walked the site, would you have been able to identify a

-16-

> recognized environmental condition based upon what you note today from site reconnaissance alone?
>
> Answer: Alone, I don't believe so.
>
> Question: Were there any signs to your knowledge on the Freeman Smith Park that would have indicated it was a former county dump?
>
> Answer: Not that it would have indicated it was a former county dump, but it certainly would have indicated it was a county park, and that the contact with the conservation board would probably lead to further information."
>
> [By Mr. Walsh] Is that an accurate reading of your the [sic] testimony?
>
> A. Yes, it is.

Mr. Williams testified that at the time of this deposition, he had not seen the color photographs of the construction debris from the adjacent property on Independent Road, which he claimed would have persuaded him to "explore[] a little further into those bushes to see if there was something else there of the same nature." However, it is clear that this construction debris was located well southeast of Freeman Smith Park, the site of the Craven Road landfill. The record supports a finding, and the parties appear to agree, that these materials were not remnants of the Craven Road landfill, which had been closed since the 1970's. Nothing in the record suggests that further investigation of the construction debris on Independent Road would have resulted in the discovery of the unrelated garbage from Craven Road landfill, which was buried several feet underground.

Mr. Samford, Pickering's expert, testified that it was acceptable practice under the ASTM Standard to allow Mr. Balogh to conduct the site reconnaissance, because it was clear that he had been under the supervision of Mr. McCaffery, who was a qualified project manager. Mr. Samford noted that Mr. Balogh had been given the limited assignment of visually inspecting the subject property for the possibility of a presence of hazardous materials, and that he had performed adequately. Mr. Samford also noted that others who had walked the site on previous occasions, including WATCO's engineer Mr. Dickinson and property co-owner Mr. Todd, had reported similar conditions to those found by Mr. Balogh and reflected in the Phase I report. Both Mr. Williams and Mr. Samford agreed that the topographical map utilized by Mr. Balogh on the site visit did not indicate unnatural filling of the subject property at the location where buried garbage was found in 2004, and that the statements in the report concerning prior gravel extraction and the uneven topography were accurate.

### 3. Interviews

The interview component of Phase I assessments under the Standard consisted of both "Interviews With Owners and Occupants" and "Interviews With Local Government Officials." For the former type of interview, section 9.5 dictated that a "key site manager" be identified by the owner

to be made available for an interview: "9.5.1 Key Site Manager – Prior to the site visit, the owner should be asked to identify a person with good knowledge of the uses and physical characteristics of the property (the key site manager)." The term "key site manager" is defined by the Standard as "the person identified by the owner of a property as having good knowledge of the uses and physical characteristics of the property."

Pickering maintains that Joel Smith fulfilled the role of key site manager in this particular Phase 1 assessment. After NBC, the ostensible owner of the property as trustee, contacted Pickering regarding obtaining the assessment, Mr. McCaffrey, on the behalf of Pickering, sent a letter agreement to Mr. Haaga, the NBC trust officer, in which Mr. McCaffrey requested "[c]ontacts at the site or the names, addresses and phone numbers of persons who are knowledgeable about the site including past and current uses, environmental reports, hazardous waste activities or regulatory actions." In response on June 1, 1995, Mr. Haaga sent a letter back to Pickering stating the following: "This will return to you an executed letter agreement for your service in performing a Phase I site assessment on the subject property. I would appreciate your contacting Joel Smith with VCM Inc. to obtain many of the items requested." Mr. Haaga further provided the address of Mr. Smith.

At trial, Mr. Smith testified that, prior to listing the subject property for sale with Mr. Haaga in 1995, he and his real estate company had considered developing the property in 1994, but had ultimately abandoned the idea. Mr. Smith recalled visiting the property approximately 10 or 12 times. He testified that when he walked the property, he saw no evidence of dumping or significant filling of the land. He described the topography of the western two-thirds of the property as "treed, and some gullies, and just a rolling ground." Mr. Smith testified that, once while visiting the subject property with Mr. Norfleet, he had been informed of the property's history of gravel mining operations. Mr. Smith also said that Mr. Norfleet had never told him that there had been a dump on the adjacent property, or that there was garbage buried beneath the subject property. Mr. McCaffery testified that in the course of his interview with Joel Smith, he asked Mr. Smith "what he knew about the property in terms of its current and prior uses," and that Mr. Smith had informed him that the subject property had been the site of gravel mining in the early 1900's. Mr. McCaffery testified that the findings of Mr. Balogh from the site reconnaissance were consistent with this prior use:

> Q.      All right. Now, what did you do in the course of your – of this interview with Mr. Smith? What did you ask him? What was your – what did you ask him?
>
> A.      I asked him what he knew about the property in terms of its current and prior uses and, you know, whether there were any environmental liens or pending threatened litigation against it. Some of the items that are in our data form, I would have run down through them: Whether there were any notices from any governmental agencies regarding violations of environmental laws; whether he had any hazardous – any

-18-

geotechnical studies or site – prior site assessments or reports on it that would help us.

. . .

Q. Did you become aware as a result of your interview with Mr. Smith of the presence of buried garbage on the subject property?

A. No, I did not.

Q. The site reconnaissance indicated – what were the physical characteristics of the western two-thirds of this property based upon your own observation and the site reconnaissance by Mr. Balog [sic]?

A. As reported by Mr. Balog [sic] and evident by the topography that the ground was heavily – the topography was very undulating or hilly, heavily incised with, you know gullies and generally not level.

Q. All right. Was it treed? Or cleared?

A. And as was evident in the aerial photographs and from Jason [Balogh], there were very strong, mature deciduous trees as well as a very healthy understory of vegetation covering the ground.

Q. Based upon – did you become aware of gravel extraction – a history of gravel extraction in the early 1900's –

A. Yes, I did; and I noted as such.

Q. – as a result of your phone interview with Mr. Smith?

A. Yes, he did tell me that.

Q. Based upon the information that you received regarding the property from Mr. Smith as part of the telephone interview, was there anything in the site reconnaissance that was done by Pickering that was inconsistent with what you had learned from the interview?

A. Nothing.

Q. Was there anything in the records that you reviewed as part of this phase 1 environmental site assessment that was inconsistent with the information that was provided in the interview with Mr. Smith?

A. Nothing was inconsistent with what he told me.

WATCO's position at trial was that real estate agent Joel Smith did not, in fact, qualify as a person with good knowledge of the uses and physical characteristics of the subject property, therefore he could not have been considered a "key site manager" for the purposes of the ASTM

Standard.[4] WATCO relies upon the trial testimony of its expert, Mr. Williams, for the notion that Pickering was obligated under the Standard to conduct interviews of additional persons who might have had good knowledge of the subject property, such as former owner Mr. Norfleet or adjoining property owners. However, on cross examination, Mr. Williams appeared to backtrack on this position:

> Q. And there is no requirement that states interviews with adjoining owners, does it? Anywhere in the standard, correct?
>
> A. No. I would say that our approach has been utilized by a person with good knowledge.
>
> Q. Is the answer is [sic] that the standard does not require interviews with adjoining owners?
>
> A. It does not specifically require it.
>
> Q. All right. Now there's no requirement in ASTM E1527 to interview former owners of the subject property in [the] 1994 version, is there?
>
> A. You really hit upon an interesting twist. It certainly does not appear to make mention of former owners, yet, obviously that would be a mighty important point if you were building a history of the usage of the property.
>
> Q. But with respect to interviews, the standard does not anywhere require an interview with a former owner, does it?
>
> A. I don't see an item that specifically identifies a requirement for an interview with a former owner.

Both experts therefore agreed that the ASTM Standard did not require interviews with adjoining landowners or former owners. Pickering's expert, Mr. Samford, testified that Mr. McCaffrey's phone interview with Mr. Smith satisfied the ASTM Standard. Mr. Samford testified that interviews with adjoining owners was not required under the Standard for several reasons, including confidentiality concerns related to the sale of the property. Mr. Samford also testified that Pickering had no knowledge of Mr. Norfleet's former ownership of the subject property, and that nothing in Pickering's file referenced Mr. Norfleet.

---

[4] Additionally, WATCO emphasizes the fact that Joel Smith was the son of the CEO of Pickering, implying that because of these familial connections, Mr. Smith had the assessment "rushed" in order to facilitate a clean report and obtain a commission on the sale of the property. The trial court addressed this circumstantial evidence in its final order, and found this conclusion improbable under the proof presented at trial. "Where the trial judge has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, on review considerable deference must still be accorded to those circumstances." *Townsend v. State*, 826 S.W.2d 434, 437 (Tenn. 1992) (quoting *Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315 (Tenn. 1987)). Considering the absence of evidence suggesting that either Smith or Pickering had knowledge of Craven Road landfill at the time of the environmental site assessment in 1995, we agree with the trial court's dismissal of this argument.

Although the Standard directed the environmental professional to make the initial inquiry, it clearly allocated the task of identifying a person with "good knowledge of the uses and physical characteristics of the property" to the owner of the property, which in this case was NBC as trustee. As a witness at trial, Mr. Haaga, who was the trust officer responsible for the property at the time of the site assessment, responded to questioning on this issue as follows:

> Q.   Okay. Did you at any time instruct or indicate to Pickering that it should only look to Joel Smith as a person to interview concerning the prior uses of the property?
>
> A.   I'd have to say, yes. You know, the only person I indicated.

With regard to this issue, the trial court found as follows:

> The letter agreement provided that Pickering would charge a fee of $1,800 for performing the [environmental site assessment]. It recited that the NBC Trust Department had advised Pickering that the Property was an undeveloped, wooded 169 acre tract of land. The letter agreement provided that, among its responsibilities, the NBC Trust Department was to provide Pickering with "Contact(s) at the site or the names, addresses and phone numbers of persons who were knowledgeable about the site including past and current uses, environmental reports, hazardous waste activities or regulatory actions." May 31, 1995 letter at p. 4. The person identified by the NBC Trust Department for this purpose was Joel Smith.

The evidence does not preponderate against these findings by the trial court.

Pickering's cross-examination of Mr. Williams regarding his own familiarity with the actions taken by Pickering and the sufficiency of the interview under the ASTM Standard elicited inconsistent responses from WATCO's expert:

> Q.   All right. Well, let's talk about the interview issue, though. At the time of your deposition, you didn't know that Mr. McCaffrey had even interviewed Joel Smith, correct?
>
> A.   That's right.
>                              . . .
> Q.   Have you since become aware of what Mr. Joel Smith – what information Mr. Joel Smith provided to Mr. McCaffrey as part of the interview?
>
> A.   Apparently passed along the information that there had been gravel mining.
>
> Q.   Did you review the Pickering records relating to the interview?

A.  Are you talking about the forms they had filled out?

Q.  Just anything. Anything in connection with the interview. You haven't read Mr. McCaffrey's deposition?

A.  I still haven't read McCaffrey's deposition.

. . .

Q.  The report. Yes. All right. But with respect to the interview issue, when I took your deposition you were unaware of the fact that Mr. Smith had been interviewed. And I asked you about that. And did you not admit to me that by interviewing Mr. Smith that Pickering had met part of the standard with respect to interviews? Do you remember that?

A.  I'm having trouble recalling it, but I would concede that that would meet part of the standard.

Q.  Because in this case, what we have –

A.  The problem is that Mr. Smith is obviously someone who did not have good knowledge.

Q.  You don't know what knowledge he had, do you?

A.  Well, judging by what has transpired, it appears he did not have good knowledge.

Q.  That's based on hindsight, is it not?

A.  By and large it's based on reviewing the materials that have been produced.

Q.  You haven't reviewed the information pertaining to Mr. Smith's knowledge, have you? You haven't reviewed the documents pertaining to what, if anything, Mr. Smith specifically told Mr. McCaffrey, have you?

A.  I have not seen those, no.

. . .

Q.  Now, NBC Bank as trustee designated Mr. Joel Smith as the contact with information about the site, correct?

A.  That's my understanding.

Q.  NBC Bank as trustee did not provide the name of anyone else including Peter Norfleet as someone to contact with regards to information on the site, correct?

A.  That's what I understand. Yes.

This testimony further undermines WATCO's contention that Pickering was required to conduct additional interviews under the ASTM Standard. We believe that it was appropriate for Pickering to rely upon NBC's designation of Joel Smith as the lone contact regarding the property, and that it was reasonable for them to infer that he was to be considered the key site manager, i.e., a person with good knowledge of the uses and physical characteristics of the subject property, for the purposes of conforming to this component of the ASTM Standard.

-22-

As for the second part of the interview component of the ASTM Standard, requiring interviews with local government officials, section 10 of the Standard provided in relevant part:

> 10.1  Objective – The objective of interviews with local government officials is to obtain information indicating recognized environmental conditions in connection with the property.
> . . .
> 10.5  Who Should Be Interviewed
> 10.5.1  Local Government Officials – A reasonable attempt shall be made to interview at least one staff member of any one of the following types of local government agencies:
> 10.5.1.1  Local fire department that serves the property,
> 10.5.1.2  Local health agency or local/regional office of state health agency serving the area in which the property is located, or
> 10.5.1.3  Local agency or local/regional office of state agency having jurisdiction over hazardous waste disposal or other environmental matters in the area in which the property is located.

With regard to this component, Mr. McCaffrey testified that he called the local office of the Tennessee Department of Environment and Conservation, Division of Superfund ("TDEC"), and that he sent a follow-up letter on June 9, 1995, requesting any information relating to hazardous substances on the subject property or any site in the vicinity. The local office of TDEC responded by letter that the subject property was not on the State's list for known or suspected releases of hazardous substances and/or petroleum substances and that there were no such properties on the State's list within a four-mile radius of the subject property. Additionally, while reviewing aerial photographs of the subject property, Mr. McCaffrey interviewed employees at the local office of the USDA Soil Conservation Service and learned that this agency was unaware of any environmental problem with the subject property. These efforts were documented in the final report submitted to WATCO prior to its closing on the subject property. Both experts agreed that these agencies were appropriate sources of knowledgeable government officials, and that these interviews technically satisfied the ASTM Standard.

After a thorough review of the ASTM Standard, the Phase I environmental assessment report prepared by Pickering in 1995, and the testimony of witnesses and exhibits offered at trial, we find that the evidence does not preponderate against the trial court's finding that Pickering conformed to the ASTM Standard in its Phase I environmental site assessment of the subject property in 1995. WATCO failed to establish, by a preponderance of the evidence, that Pickering had supplied WATCO with false information in its Phase I environmental site assessment report. We therefore affirm the judgment entered by the trial court in favor of Pickering on the claim of negligent misrepresentation in a business transaction.

## B. Breach of the Professional Standard of Care

WATCO further alleges that the trial court erroneously ruled in favor of Pickering when it held that WATCO had not established, by a preponderance of the evidence, that Pickering breached the applicable standard of care for environmental professionals conducting Phase 1 environmental site assessments in Shelby County, Tennessee or similar communities in 1995. The trial court specifically found as follows:

> A standard of care or duty was established by the letter agreement, Exhibit 7, i.e., that the work would be "in conformance with the scope of the ASTM Practice E 1527". That duty was not breached according to both experts.
> The Plaintiff argues that in addition to the ASTM Standard, the defendant, Pickering, was bound by a duty which exceeded the ASTM Standard and required the defendant Pickering, to conduct additional interviews not called for by the ASTM Standard. By not doing the additional interviews, Plaintiff argues that defendant, Pickering, breached the applicable professional standard of care in connection with the Phase 1 Environmental Site Assessment conducted in Shelby County, Tennessee in July of 1995.
> Pickering argues that it conformed to the standard of care in connection with the Phase 1 Environmental Site Assessment in Shelby County, Tennessee in July of 1995. The standard of care in connection with the Phase 1 Environmental Site Assessment conducted by Pickering in Shelby County, Tennessee in July of 1995, in Defendant's opinion, included both the ASTM Standard and the Shelby County standard. Defendant says that both the ASTM Standard and the Shelby County Standard were complied with by Pickering in that Pickering complied with the ASTM Standard and there was no duty to conduct additional interviews not contemplated by the ASTM Standard.

The trial court found that Pickering complied with the ASTM Standard and that "[t]he proof was equally balanced as to whether or not Pickering had a duty to conduct further interviews than those called for in the ASTM Standard." The latter finding is the main focus of our review of the court's judgment in favor of Pickering on WATCO's claim for professional negligence. We must consider whether the evidence preponderates in support of a finding that the standard of care for environmental professionals conducting Phase 1 assessments in Shelby County or similar communities required more thorough efforts than those exerted by Pickering in 1995 with regard to the interview component of a Phase 1 environmental site assessment.

In a negligence action, the plaintiff must establish, by a preponderance of the evidence, the following elements in order to prevail: (1) a duty of a care owed by the defendant to the plaintiff; (2)

conduct falling below that standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal cause. ***Wood v. Newman, Hayes & Dixon Ins. Agency***, 905 S.W.2d 559, 562 (Tenn. 1995) (citing ***Bradshaw v. Daniel***, 854 S.W.2d 865, 869 (Tenn. 1993)). Professionals are judged according to the standard of care required by their profession. ***Jennings v. Case***, 10 S.W.3d 625, 627-28 (Tenn. Ct. App. 1999). Tennessee courts have adopted the "same or similar community" standard of care with respect to professional negligence. ***Martin v. Barge, Waggoner, Sumner & Cannon***, 894 S.W.2d 750, 751 (Tenn. Ct. App. 1994) (citing ***Dooley v. Everett***, 805 S.W.2d 380, 384-85 (Tenn. Ct. App. 1990)); *see also* Restatement (Second) of Torts, § 299(A) (1965) ("Unless he represents that he has a greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.").

Although WATCO's two theories of recovery are closely related, we note the subtle distinction in this case that is to be made between the applicable standard of care, which defined the scope of duty as to WATCO's claim for professional negligence, and the ASTM Standard, which was developed as an industry guide for environmental professionals conducting Phase 1 environmental assessments, and which has already been addressed regarding WATCO's claim for negligent misrepresentation. The trial court specifically found that both Mr. Williams and Mr. Samford agreed that the ASTM standard "was a guideline to be used, but was not exclusive." For example, in his testimony on direct examination, WATCO's expert Mr. Williams responded to questioning as follows:

> Q. Would you state your familiarity with something called ASTM standard which is designated E1527 relative to Phase 1 environmental site assessments?
> A. The American Society of Testing Materials adopted in 1994 that particular standard as the standard for environmental site assessments.
>                          . . .
> Q. Does that document incorporate a guideline that was applicable in 1995 to environmental site assessments in Shelby County, in your opinion?
> A. It does – yes, it does. But I should say with great emphasis on the word guideline.
> Q. Okay.
> A. This is not a regulation. It's a guidance document –
> Q. Okay.
> A. – for professionals in that field. It does not require that they rigidly adhere to it, but on the other hand it's pretty much a standard that's to be utilized.

Q. Is the guide – does the adherence to this guide depend to some degree on the circumstances represented on a case-by-case basis in environmental site assessments?

A. I would say that would be an appropriate way to describe it. It certainly should be utilized with the circumstances of the individual property in mind.

Q. Mr. Williams, you have conducted site assessments in Shelby County, you've testified. Have you ranged beyond Shelby County in your practice?

A. Yes. We have done them in Detroit, Jacksonville, Florida, Indianapolis.

Q. Get over into Arkansas and Mississippi?

A. We do quite a few in eastern Arkansas, north Mississippi. That's very common.

Q. In all these locations, in your experience is ASTM E1527 the applicable guide that's used in those other locations as well as Shelby County?

A. Well, in 1995 – short answer is, yes. But in 1995 there may have been more variance.

. . .

Q. And the '94 version is the standard that is applicable for Phase 1 ESA's or environmental site assessments that were done in 1995, correct?

A. It was the guidance that was being used at that time. Quite frankly, I don't believe that most of the consultants in Memphis were rigidly adhering to it.

Mr. Samford, Pickering's expert, testified:

A. There's a fundamental distinction that you need to make between the ASTM Standard and standard of care. The standard is a prospective document[,] it's something that says this is the way you should do it. The standard of care is retrospective[,] you can only determine the standard of care in hindsight. You have to look back and see what people actually did. So to the extent that people comply with the standard and do the things that the standard suggests then the standard may be considered in hindsight the standard of care at the time. But you can't say that whatever is done tomorrow is going to be the standard of care because you don't know what that's going to be.

. . .

-26-

Q.      You don't know what the standard of care was in Virginia but you do know what it was in Shelby County where you've never even practiced. Is that your testimony?

. . .

A.      No, it can because I did an investigation of the standard of care in Shelby County, Tennessee. And, actually, I may have done one in connection with these other cases. I don't remember the dates on these, but if I had a Phase 1 site assessment case in Virginia in 1995 I would have looked at the standard of care at that point, also. But I specifically looked at what the standard of practice here was in 1995 with respect to this case. So, yes.

Q.      Okay.

A.      I do know what the standard of care here is even though I've never practiced in the area. And my opinion is not jaded by my own personal preferences. It's what people did.

> Q.      [By the Court] Let me see, for my purposes of understanding, if I can clarify what you're saying. As lawyers we approach the various issues that we're talking about including standard of care by defining things such as duty, breach of duty, et cetera.
>
> A.      Yes, sir.
>
> Q.      The duty to do or not do whatever someone should or shouldn't have done in '95 is whatever it is. Whether they breach that duty is the question that I have to decide. So are you saying – it sounds like to me you're more saying in the prospect of retrospective discussion – you're saying whether somebody did or failed to do something I don't know until it's actually happened. Is that right? The duty stays the same.
>
> A.      The duty stays the same, but it's tempered by what people typically, commonly do –
>
> Q.      Yeah. That might be a part of it.
>
> A.      – practicing in the same area at the same time.
>
> Q.      Right. There may be two bases as I understand as far as your testimony. It can be what people in the community are doing and it's then got to be analyzed in light of the standard that was put into effect in 1994 and clearly was in effect in 1995.
>
> A.      Yes.
>
> Q.      Both of those factors have to be looked at?
>
> A.      Yes, sir.

Mr. Samford's testimony is consistent with his characterization of the standard of care for Phase I assessments in the formal study and report that he prepared in May of 2005:

> The *Standard of Care* is that level of care and diligence ordinarily employed by the average firm practicing in the same geographic area and at the same time. A "standard" such as ASTM E1527 only becomes the "standard of care" if it is embraced as the ordinary way things are done. An ASTM standard practice by definition includes flexibility in the way the practice is applied to any given situation. Consequently, application of the standard practice will vary between consultants practicing in different areas and at different times.
> . . .
> Since 1987, one of the ongoing efforts of [the Association of Soil and Foundation Engineers] has been to develop an understanding of the Standard of Care for environmental site assessments . . . In 2000, ASFE published its most comprehensive assessment of the *Standard of Care* for Environmental Site Assessments. This study reported the results of a review of approximately 150 Phase 1 reports. Firms submitting reports included members of at least 5 professional organizations representing moret han 20,000 Phase 1 ESA reports per year. This ASFE study made a particular note of whether the reports attempted to conform to the ASTM Standard Practice E1527, and also, more importantly, whether they actually did strictly conform to this standard practice. The study found that 73 % of the proposals stated that they would conform to the ASTM standard E1527; and, not a single report actually was in strict conformance to the standard. This study clearly indicates that the Standard of Care and the ASTM E1527 standard practice are *not* equivalent.

We believe that the totality of both experts' testimony in this case supports the trial court's finding that the ASTM Standard and the standard of care were not equivalent at the time of the Phase 1 assessment by Pickering in 1995. "Customary conduct, while not conclusive or controlling, may be considered as furnishing a standardized gauge and as one circumstance to be weighed along with all others in determining whether or not ordinary care has been exercised." *Hames v. State*, 808 S.W.2d 41, 45-46 (Tenn. 1991) (citing *Bryan v. Hubbard*, 32 Tenn. App. 648, 225 S.W.2d 282 (Tenn. App. 1949)). Therefore, for the purposes of our review of the trial court's judgment in favor of Pickering as to professional negligence, we do not limit our focus to Pickering's actions with regard to the ASTM Standard itself, but also consider the parameters of the standard of care in actual practice by environmental professionals in Shelby County or similar communities in 1995, considering the expert testimony and proof at trial.

Mr. Williams admitted that he had not conducted a formal study of the standard of care for Shelby County and similar communities in 1995, but that his opinions were based upon his years of

experience with other environmental consulting firms, including his own firm, E.F. Williams & Associates. When asked for his opinion as to whether Pickering complied with the professional standard of care for conducting environmental site assessments in 1995 in Shelby County, WATCO's expert Mr. Williams responded:

> Well, it's my opinion that they have breached the standard in that they should have made some effort to find a knowledgeable person that they could interview who knew something about the past uses of the land around this site because once they knew that there had been gravel mining, there are too many little tell-tale indications that it occurred right on up to the boundary somewhere around the Freeman Smith Park. And you've got level ground there and so something has filled it, and you need to find somebody who can tell you something about why it was filled.

For reasons already discussed, we find that the record before this Court does not support Mr. Williams's characterization of the subject property as "level." The testimony of various witnesses at trial established that the subject property was hilly and uneven. It is unclear what other bases Mr. Williams relied upon in formulating his opinion that additional interviews were warranted under the standard of care.

Pickering's expert, Mr. Samford, also testified regarding the standard of care for environmental site assessments in Shelby County and similar communities in 1995. Mr. Samford testified that in conducting his study, he reviewed six environmental site assessments that had been conducted by other environmental professionals in Shelby County in 1995 in order "to get an idea of what other firms in the area were doing at that time this study was done." After reviewing the Pickering report, he concluded that Pickering's Phase 1 environmental site assessment conformed to the standard of care. Mr. Samford related his understanding that Joel Smith had been identified as the sole contact for information regarding the subject property, and that he had provided Pickering with information regarding its prior uses. Mr. Samford went on to explain that even if NBC had provided Pickering with contact information for the prior owner, Mr. Norfleet, the standard of care would not have required Pickering to interview him in this situation. Mr. Samford explained that the information provided by Mr. Smith regarding gravel mining in the 1900's on the subject property was consistent with the topography of the land at the time of the 1995 site reconnaissance:

> Again, the information that you got from somebody representing the owner was that there was gravel mining on the site, and you can see from that topographic map and from your site reconnaissance that there had been gravel mining on the site. That wasn't in question. And there's no evidence looking at the site, or looking at the topography, or any information that you got that anything happened between the gravel mining stopping and not. Trees had grown up,

they were mature, they, you know, reflected that the site had been just vacant.

. . .

You walk the site, you don't see any evidence of dumping, you don't see any – in a situation like this you don't even have trails and, you know, gravel or dirt roads running through the property. So there's no method of somebody getting into the property to dump. If you had an unknown road leading to a barren spot in the middle of the property you would have a different level of concern. Then you would start thinking, gee, somebody has been using this site for something since the gravel mining for other kinds of purposes. There's none of this on this site.

Mr. Samford further opined that, based upon his review of other environmental site assessment reports from Shelby County in 1995, the standard of care did not require Pickering to interview adjoining property owners or prior owners. One of these reports was a 1995 Phase 1 environmental site assessment report conducted by E.F. Williams & Associates, Mr. Williams's company. When asked about that particular assessment, Mr. Samford indicated that no interviews with an owner, former owner, or adjoining owner were reflected in the E.F. Williams & Associates report.

The evidence in the record does not preponderate against the trial court's finding that the evidence was equally balanced as to whether the standard of care for Phase 1 environmental site assessments performed in Shelby County or similar communities in 1995 required Pickering to conduct further interviews than those called for in the ASTM Standard. Therefore, WATCO failed to establish, by a preponderance of the evidence, that Pickering breached the applicable standard of care when it performed a Phase 1 environmental site assessment of the subject property in 1995. Accordingly, the trial court's judgment in favor of Pickering on the claim for professional negligence is affirmed.

## V. CONCLUSION

For the foregoing reasons, the judgment of the trial court in favor of Pickering Environmental Consultants, Inc., is affirmed. Costs are assessed against Appellant, WATCO, a joint venture comprised of Wayne Todd and Wilson Holdings, LP, and its surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE